## BIRMINGHAM BOND & MORTGAGE CO. v. LOVELL.

## LOVELL v. BIRMINGHAM BOND & MORTGAGE CO.

### No. 7868.

Circuit Court of Appeals, Fifth Circuit.

Feb. 7, 1936.

R. H. Scrivner, of Birmingham, for appellant Birmingham Bond & Mortgage Co.

Frank E. Spain, of Birmingham, Ala., and Caroline C. Lovell, in pro. per., for appellee.

Before FOSTER, HUTCHESON, and WALKER, Circuit Judges.

FOSTER, Circuit Judge.

Appellee and cross-appellant, Mrs. Caroline C. Lovell, brought this suit against appellant and cross-appellee, Birmingham Bond & Mortgage Company, to rescind the sales of certain shares of stock of said company, hereafter to be referred to, and to recover damages of $15,000, on the ground that the purchases had been induced by false representations. The parties will hereafter be referred to as they appeared in the District Court. The jury returned a verdict in favor of plaintiff for $8,110 on which judgment was entered. The pleadings are very lengthy, occupying some 75 pages of the printed record. There are 47 assignments of error by defendant and 31 assignments of error by plaintiff. We may consider the appeals together, and will not attempt to review the pleadings nor to discuss the assignments of error of either party in detail.

The material facts appearing from the record are these. Birmingham Bond & Mortgage Company was incorporated under the laws of Delaware with very broad powers, but primarily for the purpose of loaning money on mortgages secured by real estate in Birmingham, Ala. It was admitted to do business in Alabama and complied with the requirements of the State Securities Commission. The capital stock was divided into 125,000 shares, 40,-

000 shares preferred and 85,000 common, both of no par value. The charter provided: That the stock should not be sold by the company for less than $50 per share for preferred and not less than $1.00 per share for common; that a cumulative dividend of $3.50 per share should be paid annually on the preferred stock, out of net profits; that the company should have the right for 3 years to redeem the preferred stock at not less than $50 per share and accumulated dividends; that the holders of the preferred stock should have no voice in the management of the company, the sole voting power being vested in the common stock.

A prospectus published by defendant contained these statements, among others:

"The Birmingham Bond & Mortgage Company is one of the few companies doing business in Birmingham to-day which is not a 'closed corporation.' By that we mean it invites all the stockholders to share in its full earnings. The investor has an equal opportunity to participate in the entire profits.

"The Birmingham Bond & Mortgage Company does only one thing—directing its whole effort to the loaning of money on Birmingham real estate."

There was evidence to the effect that defendant endeavored to get an account from an insurance company to act as its correspondent and loan money on its behalf; that such an arrangement was made with the John Hancock Life Insurance Company, but said company was not willing to lend money in Alabama until it could establish an agency for the writing of life insurance; that defendant established this life insurance agency, in the name of one of its directors, Jay Smith, on June 8, 1926, and advanced $28,000 for that purpose; that it made loans for the insurance company on which it earned gross commissions of approximately $75,000; that the cost of establishing the agency was reduced to $19,000; that in 1932 defendant also organized the Vulcan Investment Company to take over and handle real estate defendant had acquired through foreclosure; that defendant owned all the stock of this company; that in 1932 defendant also organized a fire insurance company, in the name of the Smith Insurance Agency, for the purpose of saving on insurance premiums, all profits to belong to defendant. There was evidence tending to show that the operation of the two in-

surance agencies and the Vulcan Investment Company were beneficial and profitable to defendant; that all the treasury stock of defendant was sold prior to September 22, 1927; that dividends were paid on the preferred stock up to July 1, 1931; that in January, 1934, the market value of preferred stock was $5, and common stock had no value at all; that at the time of trial defendant owned 158 pieces of real estate, of the book value of $780,000, a large part of which was rented. It was not shown that defendant was insolvent.

On April 24, 1926, through her husband, W. S. Lovell, acting as her agent, plaintiff bought 100 shares each of common and preferred stock of defendant, paying $50 per share for the preferred and $8 per share for the common; a total of $5,800. On June 2, 1926, she bought an additional 25 shares of each class of stock at the same price; a total of $1,500. On March 1, 1927, she agreed to buy an additional 25 shares of each class of stock for $1,550, to be paid for in monthly installments. On this last purchase she paid $809.88 cash. This stock was all bought direct from defendant, through H. A. Crane, an employee of E. W. Saucier. Saucier was one of the directors and organizers of the company, who had been made general manager and given the right to make exclusive sales of stock for two years.

In February, 1929, plaintiff acquired the purchaser's rights of one Glass for 25 shares each of common and preferred stock. Glass was paid $1,244 on this transaction, and $105.98 was paid defendant. In June, 1929, plaintiff had a similar transaction with one Pickens by which 15 shares each of common and preferred stock were purchased. On this transaction $210 was paid to Pickens and $554.01 to defendant.

From September 4, 1931, to February 22, 1932, both dates inclusive, plaintiff purchased 84 shares of preferred stock and 75 shares of common stock through brokers, paying a total of $1,830.50.

Mr. W. S. Lovell testified, in substance, that he was interested in securities, particularly those of local concerns; that he had two conversations with Crane, who came to his office for the purpose of selling securities of defendant; that Crane showed him the prospectus which contained the names of the board of directors, of whom he knew about six quite well; that he knew some of the others by reputation and some not at all; that he

told Crane that he was very much impressed by the prospectus, and the board of directors and asked him what the stock sold for; that Crane told him the preferred stock sold for $50 a share and the common stock for $8 a share, but that neither preferred nor common stock would be sold unless the buyer took a corresponding number of shares of the other; that that was the rule of the company; that he told Crane he wanted to take the prospectus and analyze it and talk to his wife about it before making up his mind; that he asked Crane how much money the directors had put into the company; that he was told by Crane that each of the directors owned 1,000 shares and had paid exactly the same for the preferred stock as he was asking him, but they had paid only $1 a share for the common stock; that at the next interview he purchased the 100 shares of common and 100 shares of preferred for his wife through Crane and signed an application and purchase agreement for it; that later this was ratified by defendant; that Crane's statements were false and he later discovered that the directors owned .34,057 shares of common stock, for which they had paid initially 25 cents cash per share and had given their notes for 75 cents a share, some of which were never paid, and that together they owned only 71 shares of preferred stock. It was not disputed that the stockholdings of the directors was as stated by Lovell, but Crane denied he had made the statements attributed to him by Lovell. It was shown that Lovell attended meetings of stockholders, representing his wife, and acted as election commissioner at the meeting in January, 1931. He testified he merely helped to tabulate the vote, and did not discover how much stock each director owned until January 31, 1934, when he made inquiry as to the stockholders of defendant.

The complaint was in 9 counts; 3 for money had and received, based, respectively, on the first three transactions, which stock was bought direct from defendant. The other counts were for deceit. Defendant pleaded the general issue and the statute of limitations of 1, 3, and 6 years. At the close of the evidence defendant moved for the general affirmative charge. This was overruled. The court excluded from the jury consideration of the stock bought from brokers after September 1, 1931, and, as would appear from a colloquy between court and counsel, the jury was instructed that there was no fraud shown in the prospectus. The court then charged, in substance, that the stock upon which plaintiff might be entitled to recover should be divided into two classes; first, the stock bought direct from the corporation; and, second, the stock bought from Glass and Pickens; that as to the first class, if the jury believed Lovell and found that Crane's statements were false and material and induced plaintiff to buy the stock, and the fraud was concealed from her over a period of years and by due diligence could not have been ascertained until the 31st of January, 1934, plaintiff was entitled to rescind the contract and recover the amount paid the company for the stock bought direct, with interest, less dividends. As to the stock bought from Glass and Pickens, the jury was charged that if Crane made the statements attributed to him as agent of defendant, fraudulently and knowing them to be false, with the intention of deceiving Lovell, as plaintiff's agent, and he relied on them and continued to rely on them, and afterwards went into the market, and nothing to put him on notice had arisen during the period of years from the time the statement was made in April, 1926, until February, 1929, plaintiff was entitled to recover the difference between what she paid for the stock and the value of the stock at the time the fraud was discovered.

Plaintiff assigns error to the action of the court in excluding the stock bought from brokers from consideration by the jury, and in charging there was no fraud in the prospectus. Defendant assigns error to the refusal of the general affirmative charge.

We agree with the District Court that it was not shown that any statements in the prospectus were fraudulent and calculated to deceive plaintiff. At the time the prospectus was shown to Lovell, none of the subsidiaries had been established. The establishment of these subsidiaries was to a certain extent germane to the main business of defendant, loaning money on Birmingham real estate, and the evidence was undisputed that they were profitable to the defendant and therefore beneficial to the stockholders; nor would the ownership of a large amount of common stock by the directors, sufficient to control the corporation under ordinary circumstances, convert defendant into a closed corporation.

We also agree with the District Court in ruling against plaintiff as to recovery on the stock bought from brokers. Before that time all the treasury stock had been sold by defendant. Defendant received nothing from these sales, and the brokers were not its agents. Plaintiff was charged with knowledge that the market value of the stock was constantly going down. When she initially purchased her stock it was at the rate of $58 for a unit of one share of preferred and one share of common. The price paid Glass was approximately $54 for the same unit. The price paid Pickens was approximately $51 per unit, and the average price of the stock bought from brokers was approximately $22 for the same unit. Furthermore, plaintiff had ample opportunity, through her husband as her agent, to familiarize herself with the business of defendant. No obstacle was put in her way to examine the books and ascertain the financial condition of the company. Notwithstanding the false statements of Crane, the stock for a time was worth all that she paid for it. It would be stretching presumption too far to say that the stock purchased from brokers was bought on the faith of Crane's statements. Cheney v. Dickinson (C.C.A.) 172 F. 109, 28 L.R.A.(N.S.) 359.

It was not error to refuse the general affirmative charge. There was conflict of testimony between Lovell and Crane as to what was said by the latter when the stock was purchased. The effect of Crane's statement, if made, was that the directors owned 12,000 shares of preferred stock, for which they had contributed $600,000 to the working capital of defendant. This was untrue and material, and would warrant the rescission of the sales whether Crane believed it to be true or not. Lehigh Zinc & Iron Co. v. Bamford, 150 U.S. 665, 14 S.Ct. 219, 37 L.Ed. 1215; Alabama Foundry & Machine Works v. Dallas, 127 Ala. 513, 29 So. 459. Suit was filed within one year after the date upon which Lovell testified he had discovered the fraud. Under the provisions of section 8966 of the Alabama Code, the statute did not begin to run until the fraud was discovered. It was clearly the province of the jury to resolve the conflict in the evidence and to determine whether, on all the evidence, the statute of limitations created a bar to the suit. The charge of the court correctly stated the law, and was perfectly fair to both parties. The verdict returned is,

in round figures, exactly what plaintiff paid for the stock purchased direct from defendant, upon which she had received dividends. Evidently the jury considered the dividends equivalent to interest.

Other assignments of error are without merit and require no discussion. On the whole case we consider the verdict does substantial justice between the parties. The record presents no reversible error. The judgment is affirmed on both the appeal and cross-appeal.

Affirmed.